UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CP ST. LOUIS CASINO, LLC and CP ST. LOUIS CASINO ACQUISITION, LLC,<br><br>        Plaintiffs,<br><br>   v.<br><br>CASINO QUEEN, INC.,<br><br>        Defendant. | Case No. 07-cv-447-JPG |

### MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Casino Queen, Inc.'s Partial Motion to Dismiss (Doc. 12) to which Plaintiffs CP St. Louis Casino, LLC and CP St. Louis Casino Acquisition, LLC have responded (Doc. 16), and Casino Queen, Inc. Has replied (Doc. 17).  For the following reasons the Court **GRANTS IN PART and DENIES IN PART** Defendant's Motion.

### BACKGROUND

For purposes of this motion, accepting all of Plaintiffs's allegations as true and drawing all reasonable inferences it its favor, the Court finds the following facts.

In late 2005, Plaintiffs, CP St. Louis Casino, LLC and CP St. Louis Casino Acquisition, LLC,[1] began negotiations with Defendant, Casino Queen, to obtain ownership and control of the Casino Queen.  In April 2006, the parties entered into a Merger Agreement (the Agreement) which established the terms and conditions of the transfer.  Any such transfer would require the consent of certain governmental agencies, and St. Louis Casino would have to obtain a gaming

---

[1] For simplicity's sake, hereinafter Plaintiffs will be jointly referred to as St. Louis Casino.

licence.

A provision of the Agreement required that Casino Queen certify that no event had occurred which might place its gaming permits and licences in peril. Another provision of the Agreement required Casino Queen to certify that it was not conducting its business in violation of gaming laws and regulations and that, to its knowledge, "its directors, officers, key employees and persons performing management functions similar to officers and partners" were complying with gaming laws and regulations. Further, Casino Queen promised to promptly notify St. Louis Casino should any of its representations later be rendered untrue. Both parties also agreed to promptly notify the other in the event that either reasonably believed that governmental approval or licencing would be denied or materially delayed.

As per a clause in the Agreement regarding the transferability of stock, Casino Queen notified St. Louis Casino that Gerard Kenny, a stockholder and/or director of Casino Queen, had pledged his shares to certain other stockholders and/or directors. Casino Queen disclosed that "the validity of the pledge is an issue currently in litigation." What Casino Queen did not disclose, however, was that the stock pledge was being investigated by the Illinois Gaming Board (the Board). Furthermore, Casino Queen did not disclose that Gerard Kenny was also being investigated by the Board for alleged ties to organized crime. In January 2007, the Board ordered Gerard Kenny to economically dissociate himself from Casino Queen. In the meantime, St. Louis Casino found their application to obtain a gaming licence from the Board delayed, perhaps because of the investigations into Gerard Kenny's activities.

An outside date of December 31, 2006 was set for closing on the acquisition. However, St. Louis Casino would not have received the necessary governmental approval and licencing to

consummate the deal by that date. Therefore, as per a clause in the Agreement, the parties agreed to extend the date for closing to February 28, 2007. In exchange for Casino Queen's agreement to push back the closing date, St. Louis Casino deposited a security deposit of slightly over five million dollars into an escrow account. On or about February 26, St. Louis Casino, still waiting to obtain a gaming licence, asked for a further extension of the closing date. Casino Queen refused, and terminated the Agreement. Casino Queen kept the five million dollars in the escrow account, despite St. Louis Casino's demand that it return the money.

St. Louis Casino brought this action alleging breach of contract (Count I), fraud (Count II), violation of the Illinois Consumer Fraud and Deceptive Practices Act (Consumer Fraud Act) (Count III), violation of section 10(b) of the Securities and Exchange Act (SEA) and implementing rule 10b-5 (Count IV), and unjust enrichment (Count V). Casino Queen moved to dismiss Counts II, III, IV.

## ANALYSIS

When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all allegations as true and draws all reasonable inferences in favor of the plaintiff. *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005); *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir. 2000). The Court should not grant a motion to dismiss unless it appears beyond doubt that the plaintiff cannot prove his claim under any set of facts consistent with the complaint. *Brown*, 398 F.3d at 908-09; *Holman*, 211 F.3d at 405. "[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." *Brown*, 398 F.3d at 909 (internal quotations omitted); *see Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006).

**I.      Count II - Fraud**

Generally, courts will not grant a motion to dismiss merely because the complaint is vague or lacking in detail so long as it pleads "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir. 2002); *see Kolupa*, 438 F.3d at 714-15; *Brown*, 398 F.3d at 908. There is an exception to this general rule, however, regarding allegations of fraud. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. Pro. 9(b). The "circumstances constituting fraud" must include the "who, what, when, where and how: the first paragraph of any newspaper story.*" DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

St. Louis Casino has stated the circumstances of the alleged fraud with sufficient particularity. The complaint alleges that, during the period of time covered by the Agreement, Casino Queen falsely certified that it had no knowledge of any events or actions by its directors which might put its gaming licence and permits in peril, and that it had no reason to believe that governmental approval of the transaction might be materially delayed. St. Louis Casino alleges that the Board's investigations into Gerard Kenny were known to Casino Queen and that Casino Queen knew that the investigations could reasonably be expected to delay the ability of St. Louis Casino to obtain the necessary licenses and governmental approval of the transaction. St. Louis Casino alleges that by making such false certifications, Casino Queen induced them to believe that the transaction could proceed as planned, which caused them to lose their five million dollar

security deposit. Thus, St. Louis Casino has set out the who, what, where, when, and how of the alleged fraud. Therefore, the requirements of Rule 9(b) are met.

Alternatively, Casino Queen asks the Court to dismiss Count II of the complaint claiming that St. Louis Casino cannot show that Casino Queen had a duty under the Agreement to disclose the Board's investigations. Casino Queen also contends that St. Louis Casino will be unable to prove that Casino Queen's failure to disclose caused St. Louis Casino to lose the security deposit. These issues are more appropriately addressed to a motion for summary judgment.

For purposes of this motion, it is possible to hypothesize a set of facts, consistent with the particular facts alleged in the complaint, that would entitle St. Louis Casino to relief. Accepting all St. Louis Casino allegations as true and drawing all reasonable inferences in their favor, it is possible that the Board's investigation of Gerard Kenny was the type of event which would likely result in a material delay or denial of governmental approval of the transaction, therefore Casino Queen was under a duty to disclose it under one or more provisions of the Agreement. It is also possible that Casino Queen falsely certified to St. Louis Casino that they had no knowledge of any such event in order to induce St. Louis Casino to proceed with the transaction and put up the five million dollar security deposit. Finally, it is possible that Casino Queen's false certification resulted in St. Louis Casino being unable to obtain licensing in time for the closing, thereby losing their security deposit. Whether St. Louis Casino will ultimately be able to prove these allegations is a question for another day. Accordingly, the Court will not dismiss Count II.

**II.      Count III - Consumer Fraud Act**

Casino Queen asks the Court to dismiss Count III because St. Louis Casino has not pled

that they have standing to bring a cause of action under the Consumer Fraud Act.

The Consumer Fraud Act, in relevant part, reads:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use of any deception, fraud, false pretense, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

In deciding whether St. Louis Casino has properly alleged standing under the Consumer Fraud Act, the Court looks to Illinois courts' decisions on the issue. *Athey Products Corp. V. Harris Bank Roselle*, 89 F.3d 430, 436-37 (7th Cir. 1996). As its name implies, the Consumer Fraud Act is concerned with the protection of consumers. However, a plaintiff need not be a consumer himself in order to have standing to bring a Consumer Fraud Act cause of action. *3Com Corp. v. Electronic Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 933 (N.D. Ill. 2000). Illinois courts have consistently held that when both parties to the suit are commercial entities which are not themselves consumers, the test for standing is whether the alleged fraud either invokes trade practices addressed to the market generally or otherwise implicates consumer protection concerns. *See Lake County Grading Co. Of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 654 N.E.2d 1109, 1115-16 (Ill. App. Ct. 1995); *Scarsdale Builders, Inc. v. Ryland Group, Inc.*, 911 F.Supp. 337, 340 (N.D. Ill. 1996); *Web Communications Group, Inc. v. Gateway 2000, Inc.*, 889 F.Supp. 316, 322 (N.D. Ill. 1995).

First, the Court notes that St. Louis Casino's complaint fails to assert either that they are themselves consumers within the meaning of the Consumer Fraud Act or that the fraud alleged

implicates consumer protection concerns. Instead, in their reply brief, St. Louis Casino asserts that because the defendant is a casino, and the gaming industry relies on the trust of the public, fraud in connection with any contract entered into by a casino must implicate consumer protection concerns. St. Louis Casino cites no authority for such a *per se* rule, nor do any precedential holdings indicate that all acts of certain industries necessarily implicate consumer protection concerns, without regard to whether consumers were actually affected.

Here, St. Louis Casino does not allege that Casino Queen's conduct vis-a-vis its customers has been fraudulent in any way, or that consumers were affected at all by Casino Queen's fraudulent conduct. Instead, at issue is a dispute over a business contract entered into by sophisticated entities. Accordingly, even if the Court were willing to look outside the pleadings for the consumer nexus necessary to sustain a claim under the Consumer Fraud Act, the nexus advanced by St. Louis Casino is far too tenuous to support its standing to bring such a claim. Therefore, the Court finds that St. Louis Casino has not sufficiently pled that it has standing to bring a claim under the Consumer Fraud Act, and will dismiss Count III.

**III.     Count IV - Securities Fraud**

Casino Queen asks the Court to dismiss Count IV of the complaint because St. Louis Casino has not sufficiently alleged that Casino Queen had the requisite scienter to be held liable under the SEA.

In order to state a claim under section 10(b) of the SEA and implementing rule 17 C.F.R. § 10b-5, St. Louis Casino must allege that: (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the

plaintiff's damages. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997).

Section 10(b) claims must meet the heightened pleading requirements of the Private Securities Litigation Reform Act (PLSRA). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,–-U.S. -–; 127 S. Ct. 2499, 2507-08 (2007). Specifically, such a claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This is in contrast to Rule 9(b) which allows scienter to be pled generally. *Tellabs* at 2507-08. In deciding a 12(b)(6) motion in connection with a section 10(b) claim, the Court must find, not merely that the plaintiff has alleged facts from which it would be reasonable or permissible to infer scienter, rather facts from which the inference of scienter is "strong in light of other explanations." *Id*. at 2510. "To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*.

St. Louis Casino's complaint does not meet this test. The complaint sets forth facts from which a trier of fact could permissibly find that Casino Queen knowingly withheld information deemed material under the Agreement in order to induce St. Louis Casino to put up the five million dollar security deposit. However, in light of all the facts alleged, several alternative inferences are more compelling. For example, a trier of fact could easily conclude that the information withheld by Casino Queen was not material information under the terms of the

8

Agreement; or that Casino Queen honestly and reasonably believed that its information about the Board's investigations were not material under the Agreement; or that the information was adequately disclosed under the Agreement; or that Casino Queen honestly and reasonably believed that the information was adequately disclosed; or that Casino Queen agreed to extend the closing date in the hopes of consummating the 200 million dollar deal, rather than in hopes of defrauding St. Louis Casino out of a five million dollar security deposit. In light of the complexity of the Agreement, the time and resources both parties invested in it, and the fact that the security deposit was small in comparison to the purchase price involved, the inference that Casino Queen acted with scienter to defraud St. Louis Casino out of five million dollars is not very compelling. In other words, the facts give rise to a permissible inference of a culpable state of mind on the part of Casino Queen, but not the strong inference required by the PLSRA. Accordingly, the Court finds that St. Louis Casino has not sufficiently stated a claim, and will, therefore, dismiss Count IV.

## CONCLUSION

The Court **GRANTS IN PART AND DENIES IN PART** Defendant Casino Queen's Partial Motion to Dismiss (Doc. 12). The Court **DENIES** the Motion to Dismiss as to Count II. The Court **GRANTS** the Motion as to Counts III and IV, and they are **DISMISSED WITHOUT PREJUDICE**. The Plaintiffs are **GRANTED two weeks** from the entry of this

Order **in which to file an amended complaint** correcting the deficiencies addressed in this

Order.

**IT IS SO ORDERED.**
**DATED: October 23, 2007**

                                                        s/ J. Phil Gilbert
                                                        **J. PHIL GILBERT**
                                                        **DISTRICT JUDGE**