UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CP ST. LOUIS CASINO, LLC and CP ST. LOUIS CASINO ACQUISITION, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CASINO QUEEN, INC.,<br><br>Defendant. | Case No. 07-cv-447-JPG |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Casino Queen, Inc.'s Motion for Summary Judgment (Doc. 40). Plaintiffs have responded and Defendant has replied. For the following reasons, the Court GRANTS the Motion.

## BACKGROUND

**I. Facts**

In late 2005, Plaintiffs, CP St. Louis Casino, LLC and CP St. Louis Casino Acquisition, LLC,[1] began negotiations with Defendant, Casino Queen, to obtain ownership and control of the Casino Queen for an aggregate purchase price of $200 million. In April 2006, the parties entered into a Merger Agreement (the Agreement) which established the terms and conditions of the transfer. Any such transfer would require the consent of certain governmental agencies, and St. Louis Casino would have to obtain a gaming licence prior to the closing.

A provision of the Agreement required that Casino Queen certify that, to its knowledge,

---

[1] For simplicity's sake, hereinafter Plaintiffs will be jointly referred to as St. Louis Casino.

1

except as disclosed in a concurrently executed Company Disclosure Letter, no event had occurred which might place its gaming permits and licences in peril. Another provision of the Agreement required Casino Queen to certify that it was not conducting its business in violation of gaming laws and regulations and that, except as disclosed in the Company Disclosure Letter, to its knowledge, "its directors, officers, key employees and persons performing management functions similar to officers and partners" were complying with gaming laws and regulations. In another provision of the Agreement, Casino Queen represented to St. Louis Casino that, except as disclosed in the Company Disclosure Letter, to its knowledge "there are no facts which, if known to the regulators under the Gaming Laws will or would be reasonably likely to result in the revocation, limitation or suspension of any material license, finding of suitability, registration, permit or approval related to the Company or the Property under the Gaming Laws." Further, Casino Queen promised to promptly notify St. Louis Casino should any of its representations later be rendered untrue. Both parties also agreed to promptly notify the other in the event that either reasonably believed that governmental approval or licencing would be denied or materially delayed.

As per a clause in the Agreement regarding the transferability of stock, Casino Queen notified St. Louis Casino via the Company Disclosure Letter, that Gerard Kenny, a minority shareholder of Casino Queen, had pledged his shares to certain other stockholders and/or directors. Casino Queen disclosed that "the validity of the pledge is an issue currently in litigation." What Casino Queen did not disclose, however, was that the stock pledge was being investigated by the Illinois Gaming Board (IGB) because it was undertaken without prior IGB approval as required by law. The IGB could potentially have taken action against Casino Queen

as well as against Kenny for the unapproved stock pledge.  Furthermore, Casino Queen did not disclose that Gerard Kenny was being investigated by the Board for alleged ties to organized crime in the development of another, unrelated, casino.  Casino Queen voluntarily contacted the IGB on or about October 2, 2005, in response to an article appearing in the Chicago Tribune that alleged that Gerard Kenny was associating with known members of organized crime.  Casino Queen told the IGB that Kenny was a minority shareholder who was not a key person with the casino and who held no active policy or management role in the casino.  In response to an IGB request, Casino Queen provided the IGB with Kenny's contact information.  The IGB did not formally notify Casino Queen that it was investigating either Kenny's stock pledge or his alleged mob ties, nor did it inform Casino Queen as to the status of its investigations.  On January 8, 2007, Casino Queen was notified that the IGB had concluded investigations into Kenny and would release its conclusions at an open meeting the next day.  On January 9, 2007, the IGB ordered Gerard Kenny to economically dissociate himself from Casino Queen.

In the meantime, and completely unrelated to the Kenny investigations, St. Louis Casino found its application to obtain a gaming licence from the Board delayed.  An outside date of December 31, 2006 was set for closing on the acquisition.  However, St. Louis Casino believed it would not receive the necessary governmental approval and licencing to consummate the deal by that date.  Therefore, as per a clause in the Agreement, the parties agreed to extend the date for closing to February 28, 2007.  In exchange for Casino Queen's agreement to push back the closing date, St. Louis Casino agreed to place in excess of five million dollars (the early disbursement proceeds) in an escrow account to be held there until the later of the closing date under the Agreement or the termination of the Agreement.  In the event that the entities

consummated the deal, the early disbursement proceeds would be applied toward the purchase price. In the event the deal could not be consummated "due to a breach by [Casino Queen] of its representations, warrantees, covenants, or obligations and [St. Louis Casino's] election to terminate pursuant to Section 9.1(c) of the Merger Agreement," Casino Queen agreed to return the early disbursement proceeds to St. Louis Casino within two business days. If neither of those events occurred, the funds would be released to Casino Queen.

St. Louis Casino did not attempt to terminate the Agreement, and the deal did not close. Instead, on or about February 26, 2007, St. Louis Casino, still waiting to obtain a gaming licence, asked for a further extension of the closing date. Casino Queen refused, and terminated the Agreement. Casino Queen kept the early disbursement proceeds, despite St. Louis Casino's demand that it return the money.

## II. Procedural Posture

St. Louis Casino brought this action alleging breach of contract (Count I), fraud (Count II), violation of the Illinois Consumer Fraud and Deceptive Practices Act (Consumer Fraud Act) (Count III), violation of section 10(b) of the Securities and Exchange Act (SEA) and implementing rule 10b-5 (Count IV), and unjust enrichment (Count V). St. Louis Casino voluntarily dismissed Count III.

Casino Queen contends that it is entitled to summary judgment on Count I because (1) Casino Queen made all disclosures required under the Agreement and therefore, was not in breach of it, (2) St. Louis Casino did not fulfill its obligations under the contract, and (3) St. Louis Casino suffered no damages as a result of any breach by Casino Queen.

Casino Queen argues that it is entitled to summary judgment on Count II because (1) it

did not fraudulently conceal any material fact from St. Louis Casino, (2) it had no duty to disclose any information not specifically addressed in the Agreement, (3) St. Louis Casino was not justified in relying on Casino Queen's silence as to the doings of Gerard Kenny, and (4) St. Louis Casino did not suffer any damages as a result of Casino Queen's non-disclosures.

Casino Queen contends it is entitled to summary judgment on Count IV because (1) St. Louis Casino was not justified in relying on Casino Queen's silence as to the doings of Gerard Kenny and (2) St. Louis Casino cannot prove loss causation.

Finally, Casino Queen contends that it is entitled to summary judgment on Count V because a contract governs the parties's relationship, thus precluding an action in quasi-contract.

**ANALYSIS**

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.,* 211 F.3d 392, 396 (7th Cir. 2000). The Court construes all facts in the light most favorable to the nonmoving party and draws all justifiable inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Spath,* 211 F.3d at 396.

The moving party has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp.,* 477 U.S. at 323. If it meets this burden, the nonmoving party must set forth facts that demonstrate the existence of a genuine issue of material fact. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322-26; *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir. 1996). The nonmoving party must do more than cast "some metaphysical doubt as to the material

5

facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000). Rather, the nonmoving party must demonstrate to the Court that the evidence is such that a reasonable jury could return a verdict in his favor. *Anderson,* 477 U.S. at 248; *Insolia v. Phillip Morris, Inc.,* 216 F.3d 596 (7th Cir. 2000). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Anderson,* 477 U.S. at 248-250.

**I.     Unjust Enrichment**

Illinois law[2] is clear that "a plaintiff cannot pursue a quasi-contractual claim where there is an enforceable express contract between the parties." *Barry Mogul and Assoc., Inc. v Terrestris Development Co.*, 643 N.E.2d 245 (Ill. App. Ct. 1994). Here, there is no dispute that the Merger Agreement governs the relationship between the parties and the retention of the early disbursement proceeds by Casino Queen. Therefore, no quasi-contractual claim for unjust enrichment will lie. Casino Queen is entitled to summary judgment on Count V.

**II.    Securities Fraud**

The implementing SEC rule at issue in Count IV reads, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,. . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5

The Seventh Circuit has held that in order to state a claim under section 10b-5, the

---

[2]The parties agree that Illinois law controls as per a choice of law clause contained in the Agreement.

plaintiff must allege that: (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997).

The causation element has two parts: loss causation and transaction causation. *Id*. This means the plaintiffs must plead and prove not only that the fraud was the reason they entered into the transaction, but that the fraud was the reason the investment turned out to be a losing one. *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir. 1990). "If the plaintiffs would have lost their investment regardless of the fraud, any award of damages to them would be a windfall," which rule 10b-5 does not permit. *Id*. at 684-85.

In *Caremark*, the Seventh Circuit held that the plaintiff had adequately pled loss causation when it alleged that the defendant's omission caused the plaintiff to undervalue the risk it was taking in accepting the defendant's notes, which subsequently decreased in value, as payment. *Caremark*, 113 F.3d at 649. However, the opinion in *Caremark* went on to note, "Our holding does not preclude Coram from submitting, at the summary judgment stage, that Caremark cannot prove the loss causation that it has alleged in this complaint. At summary judgment, this burden usually is met by establishing that the decline in the value of the security is attributable in total to some other factor." *Id*. at 649-50.

Here, St. Louis Casino has shown evidence of transaction causation by asserting that, had it known about the Kenny investigations, it would not have entered into the transaction to extend the closing date. St. Louis Casino attempts to show evidence of loss causation by asserting that it undervalued the risk that a gaming license would not be forthcoming in time for the closing

7

because it did not know that the Kenny investigations were delaying its application. However, the uncontroverted evidence shows that the Kenny investigations did not delay St. Louis Casino's gaming license application. IGB chief counsel Michael Fries and IGB representative Mark Ostrowski both testified in their depositions that the Kenny investigations did not play any role in the delay of or rejection of St. Louis Casino's application for a gaming license. St. Louis Casino has not put forth any evidence from which a reasonable trier of fact could conclude that the investment of the early disbursement proceeds turned out to be a losing one because of the Kenny investigations. Rather, the investment of those funds turned out to be a bad one for reasons wholly unrelated to the misrepresentations of Casino Queen, i.e., the rejection of St. Louis Casino's application for a gaming license. Had St. Louis Casino's application been approved, the closing would have gone forward, the early disbursement proceeds would have been applied toward the purchase of Casino Queen, and the investment of those funds would have been a good one. The evidence is undisputed that the rejection was independent of the Kenny investigations. Therefore, St. Louis Casino would have lost the early disbursement proceeds regardless of the fraud. As a result, any award to St. Louis Casino would be a windfall, which Rule 10b-5 does not permit. Casino Queen is, therefore, entitled to summary judgment on Count IV.

### III.     Fraudulent Misrepresentation

In Illinois, "the elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, Ltd.,

8

675 N.E.2d 584, 591 (Ill. 1996). The omission or concealment of a material fact by one who has a duty to speak also amounts to fraudulent misrepresentation. *Havoco of America, Ltd. v. Sumitomo Corp. of America*, 971 F.2d 1332, 1341 (7th Cir. 1992) (citing *Cotter v. Parrish*, 520 N.E.2d 1172, 1175 (Ill. 1988)).

Here, Casino Queen disputes that it had a duty to inform St. Louis Casino of the Kenny investigations, that it had knowledge that its representations were false, that St. Louis Casino was justified in relying on its silence, and that St. Louis Casino suffered any damages as a result of its silence. Dispositive of this claim is the fact that St. Louis Casino has put forth no evidence from which a reasonable trier of fact could find that the silence of Casino Queen about the Kenny investigations caused St. Louis Casino to suffer any damages. Damages are a necessary element of the *prima facie* case for fraudulent misrepresentation. *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 10 (Ill. App. Ct. 2001).

St. Louis Casino claims that it "would not have entered into the extension, and would not have put up in excess of $5 million to do so," had Casino Queen informed it about the Kenny investigations. That may be true, as far as it goes. However, St. Louis Casino did not suffer any damages merely by placing the early disbursement proceeds in escrow. Rather, the economic harm was suffered when St. Louis Casino was forced to forfeit those funds. It was only forced to forfeit the funds because it was unable to secure a gaming license in time for the closing. As analyzed above, there is uncontroverted evidence that St. Louis Casino's inability to secure a gaming license was completely unrelated to the Kenny investigations. As St. Louis Casino's damages were unrelated to the misrepresentations of Casino Queen, St. Louis Casino cannot establish one of the elements of its *prima facie* case for fraud. Accordingly, Casino Queen is

entitled to summary judgment on Count II.

## IV. Breach of Contract

For similar reasons, Casino Queen is entitled to summary judgment on the breach of contract claim. In order to prevail on a breach of contract claim in Illinois, the plaintiff must establish the existence of the contract purportedly breached by the defendant, the plaintiff's performance of all contractual conditions required of him, the facts of the defendant's alleged breach, and the existence of damages as a consequence thereof. *Thilman & Co. v. Esposito* 408 N.E.2d 1014, 1020 (Ill. App. Ct. 1980); *Martin-Trigona v. Bloomington Federal Sav. & Loan Ass'n*, 428 N.E.2d 1028, 1031 (Ill. App. Ct. 1981).

Here, St. Louis Casino cannot prevail because it cannot establish that it performed all of the contractual conditions required of it, nor can it establish that it suffered damages as a result of any breach by Casino Queen. As already noted, St. Louis Casino forfeited the early disbursement proceeds because it was unable to secure a gaming license in time to close the Merger Agreement. St. Louis Casino was required by the Agreement to secure a gaming license from the IGB before the parties closed the deal. St. Louis Casino did not secure a gaming license, and in that way failed to perform one of its contractual obligations.

The non-performance by a party of his contractual obligations will be excused when that performance is prevented by the actions of the other party. *Yale Dev. Co., Inc. v. Oak Park Trust & Sav. Bank*, 325 N.E.2d 418, 422 (Ill. App. Ct. 1975). The court may accept as true the party's assurance that he would have performed if he had not been prevented from doing so. *In re Edgewater Medical Center*, 373 B.R. 845, 858 (Bkrtcy. N.D.Ill. 2007) (citing *Levy & Hipple Motor Co. v. City Motor Cab Co.*, 174 Ill.App. 20 (Ill. App. Ct. 1912)). However, here, the

10

depositions of the IGB representatives make it clear that St. Louis Casino was not prevented from securing its gaming license by the actions of Casino Queen.  Therefore, St. Louis Casino's non-performance is not excused.  Because it did not perform the conditions required of it under the Agreement, St. Louis Casino cannot maintain an action for breach of the Agreement.

Additionally, as analyzed above, St. Louis Casino is unable to show that the misrepresentations of Casino Queen were the cause of the damages of which St. Louis Casino complains, that is the forfeiture of the early disbursement funds.  Accordingly, Casino Queen is entitled to summary judgment on Count I.

Casino Queen has met its burden of establishing that there are no genuine issues of material fact to be resolved and that it is entitled to judgment as a matter of law on all counts of the Complaint.  St. Louis Casino has provided no evidence from which a reasonable trier of fact could find in its favor on any of its claims.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment (Doc. 40).  The Clerk of Court is DIRECTED to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED: March 11, 2009**

              s/ J. Phil Gilbert
              **J. PHIL GILBERT**
              **DISTRICT JUDGE**